KEATING *v.* PATRONS' MUTUAL FIRE INSURANCE CO. OF MICHIGAN.

1. INSURANCE—AMENDMENT OF PLEADING—TIME.
     An amendment of the alleged date of a policy in a declaration upon a lost policy of insurance in a mutual benefit association, from September 11th, 1908, to September 18th, 1908, was a proper exercise of discretion; it appearing that the error in date was caused by a letter from defendant's agent in which he stated that the policy was issued September 11th.

2. SAME—LAPSE—PAYMENT FOR PLAINTIFF'S BENEFIT.
     It was properly left as a question of fact for the jury to say whether or not plaintiff was in default under the terms of his policy, which was subject to a by-law providing that a default of six months in his dues to a local organization connected with defendant should avoid the policy, where it was shown that a member of the organization in good faith agreed to pay the same, and the secretary of the organization had money of such member in her possession, which she treated as paid on the delinquent dues.

Error to Alpena; Emerick, J. Submitted January 20, 1910. (Docket No. 107.) Decided April 1, 1910.

Assumpsit by Charles Keating against the Patrons' Mutual Fire Insurance Company of Michigan, Limited, on a policy of insurance. A judgment for plaintiff is reviewed by defendant on writ of error. Affirmed.

*E. C. Chapin,* for appellant.

*O'Brien & Francis,* for appellee.

MONTGOMERY, C. J. This action is brought upon a mutual insurance policy. The plaintiff suffered a loss, and recovered the sum of $865.75.

The original application for insurance was made in April, 1907. On the 18th of September, 1908, this risk was reviewed, and the policy increased from $2,400 to

$2,500, and a new application made. The declaration averred that on the 1st day of May, 1907, in consideration of certain agreements on the part of the plaintiff, the defendant association issued its insurance policy to the amount of $2,400, and further averred that subsequently, on the 11th of September, 1908, the amount was increased to $2,500, apportioned as follows: $600 on dwelling, $600 on barn, $300 on contents of dwelling, $500 on contents of barn, and $500 on live stock. The certificate was duly numbered, but, by reason of the certificate being destroyed, the number thereof was unknown to the plaintiff. The policy or certificate as reviewed was dated September 11, 1908.

The defense interposed was that at the date of the alleged destruction of the building and the contents thereof by fire the dues and assessments required to be paid by the terms of the policy were not all paid but were in arrears, and that, by reason of the failure of the plaintiff to pay such dues and assessments, the policy was null and void at the time of the fire. The case came on for trial before a jury, and it was objected that the policy of insurance issued in 1908 was a new policy of insurance, and this objection was based in part upon the ground that the policy issued in 1907 had been rendered void by a failure of plaintiff to pay his grange dues. The circuit judge permitted an amendment of the declaration changing the date to September 18th, which was the real date of the issuance of the second policy, and overruled the objection.

We think no error was committed in this ruling. The defendant's general agent, in response to a letter from the plaintiff asking the date of his policy, replied by the following letter:

"O'BRIEN & FRANCIS,
    "Alpena.
"Charles Keating insured with us May 1st, 1907; the amount of his insurance was $2,400. Sept. 11th, 1908, his risk was reviewed and his insurance was increased to $2,500. The items originally were $600 on dwelling; $600

on barn; $300 on contents of dwelling; $100 on musical instrument; $300 contents of barn; $500 live stock. When his risk was reviewed he changed by taking the insurance off of musical instrument and adding $200 to contents of barn.    The other items remained the same.

"Very truly yours,
"E. A. HOLDEN."

The pleader appears to have followed this letter as well as he could, and there can be no doubt about the cause of action having been properly set out.    The error as to the date of September 11th, instead of September 18th, was one which the defendant's agent was responsible for, and an amendment was properly allowed to correct it.    The defendant saw fit to plead the general issue to this declaration, and, while it is not full in its averments as to the policy, it was sufficient to apprise defendant fully of the nature of the plaintiff's claims.

The defense chiefly relied upon is that plaintiff's policy had lapsed, and that the second policy was invalid from the first because the plaintiff had failed to pay his dues to the Grange, an organization distinct from that of defendant, but apparently associated with the defendant in its policies.    Section 26⅔ of the by-laws of the Grange provides:

"Every policy holder shall keep his dues in the subordinate Grange of which he is a member fully paid up and any policy holder who shall permit or allow his dues to remain unpaid for the space of six months voids his policy and the company shall not be liable for loss or damage thereafter."

It appears that when this policy of September 18, 1908, was taken out, Frank La Chappelle acted for the defendant.    On the 14th of September, 1908, he was at the house of Mr. William A. Hall, whose wife, Mary E. Hall, was secretary of the local Grange.    The subject of the policy of plaintiff was discussed.    Mr. La Chappelle says that Mrs. Hall then told him that plaintiff was over a year behind in his dues to the Grange, and he then made the remark that that was too bad, for he had sent him the appli-

cation. Mr. Hall spoke up and said, "Well, to help you out, I will go good for Charlie," meaning plaintiff. Mr. La Chappelle further testifies that, "I took it by that that he would see, did pay it himself, or see that it was straightened up." Mr. Hall testified:

"I spoke right up and said: 'I will come good for his dues, so as to make you all right. Send your policy in. I will come good for those dues. I will pay them myself.' Well, Mr. La Chappelle says: 'Well, then, all right.' He says: 'That makes the thing all right with me. I can send the policy in.'
"*Q.* Did you go good for those dues?
"*A.* I certainly did."

Mrs. Hall testified:

"*A.* Mr. La Chappelle said that Mr. Keating didn't know how he stood in the Grange. I told him he was behind, and looked it up, and saw how much he was behind. He hadn't paid any dues since July 1, 1907. He said Mr. Keating had asked Mr. Butler to go to Marston's and get the money and pay his dues. I said: 'What if he should forget it?' And Mr. Hall said—spoke up and said that he would go good for it. He would pay it until Mr. Keating came back, so the policy might go on.
"*Q.* Now, did Mr. Hall pay it at that time?
"*A.* Well, he paid it in that way. He instructed me to pay it, expected I would make the receipt right then, but I didn't because I hadn't got my work out around, my Grange work.
"*Q.* Did Mr. Hall give you any money at that time?
"*A.* No; he didn't hand me the money. I had the money in my desk.
"*Q.* Mr. Hall's money?
"*A.* My money and Mr. Hall's money and Grange money, and several other moneys.   *   *   *   I considered Mr. Keating's dues paid."

The circuit court charged the jury:

"Now, in the first place, gentlemen, of course, it is for you to determine what these people did say, and the intention with which they said it. I say that the intention of these two people at that time is an important element in your determination of this question of whether pay-

ment was made or not. Now, gentlemen, suppose the facts to exist that I have just mentioned, that Mrs. Hall had certain money in her desk in her room that belonged to Mr. Hall, that she had her own money there, and that she had the Grange money or Grange moneys in her desk together, if you please. They may have been all in one pocketbook, for all that I know. We will suppose that. Now, if Mr. Hall had then and there said to his wife, when this subject of the delinquency of Mr. Keating's dues was brought up, 'I will pay Mr. Keating's dues,' and Mrs. Hall had gotten up and gone into her room and opened her desk and taken out a sum of money belonging to Mr. Hall, and carried it out into the room where Mr. Hall was, and given it to him, and he had taken and counted out from his money, $1.80, and handed it back to Mrs. Hall, and she had gone and put it in the depository where she kept it, I presume it would be conceded that upon that occasion and by those actions Mr. Hall had paid Mr. Keating's dues. I presume it would be conceded. The question is: Was it necessary that he should do those things, all of them or some of them, or not? Now, I claim, gentlemen, that it was not necessary for him to have done all of those things, or any of them, if it was then and there positively agreed by the words used between Mr. and Mrs. Hall, that he turned over to her as present payment of Mr. Keating's dues $1.80, that they could do it in that way. If that was their honest, bona fide understanding and intention at the time to then and there make a present payment of that sum of money, that they could do it without actually handling the money. I say they could have gone through this performance which I have indicated, and without an honest intention, and it would have been no payment. It might have been a mere play that they had made up between themselves. But if they then and there honestly agreed—Mr. Hall declared that he paid the dues of Mr. Keating, and that Mrs. Hall accepted it as a present payment—I say that they might have done it in that way; but that nothing short of that would amount to a payment. It would not have done for Mr. Hall to have said that he became responsible, or intended to agree to become responsible in some collateral manner. It would not have done at all for him to have said that he would become good for them if Mr. Butler didn't pay them—or if Mr. Keating didn't pay them. Nothing of that kind would do. Nothing of that kind

would amount to a payment, and would not have been sufficient to have validated this policy.    You understand. I think you must understand what I mean.    He must have then and there agreed to have paid those dues then, and Mrs. Hall must have honestly intended to accept that money as a payment, and not a conditional payment, nor a collateral agreement to pay them, if some one else didn't —if Mr. Butler didn't, or if Mr. Keating didn't—or upon any contingency whatever.    He must absolutely have turned over the money.    And, gentlemen of the jury, if you believe by a fair weight and preponderance of the evidence in this case, that that was the agreement between the parties at that time, then it would be a payment in the law.    And, if you are not able to find that fact by a fair weight and preponderance of the evidence, it would not be, and the plaintiff could not recover in this case. Now, that is the single question of fact at issue in this case, on which it is to turn.    All this evidence that has been admitted here is for your consideration, as bearing upon that one point, upon that one question, of payment or nonpayment."

It is contended by the defendant that the record conclusively shows that this agreement on the part of Mr. Hall was a collateral agreement, and did not amount to payment.    We think otherwise.    We think that it was a fair question for the jury as to what the real intent of the parties was, as evidenced by their conversation at this time, and that the circuit court did not err in submitting that question to the jury.

The judgment is affirmed.

OSTRANDER, HOOKER, MOORE, and STONE, JJ., concurred.